Case number 15-1074-L Ampersand Publishing, LLC Petitioner v. National Labor Relations Board Ms. Barver for the petitioner, Mr. Jost for the respondent Good morning, may it please the court Good morning Anna Barver for Ampersand Publishing, doing business as the Santa Barbara News Press The First Amendment affords newspaper publishers the absolute authority to dictate the contents of their papers. Accordingly, the National Labor Relations Act must yield in those circumstances when the First Amendment rights of our free press are affected in certain circumstances. Four years ago, in Ampersand 1, this court held that the union at the news press was formed primarily to conjure the authority to make content decisions from the publisher's hands and place it in the hands of the reporter employees. I believe I did say that the union was its primary purpose was during Ampersand 1. I believe that is one of the ultimate findings of Ampersand 1, Your Honor. We don't make findings. Well, one of the ultimate holdings of Ampersand 1. That that was primarily the purpose of the union? Well, that that was a major impetus driving the union. I thought we were deciding a particular ULP complaint and we said that that was not valid because that particular activity involved the intent of the union to seize editorial control. Did we really say that that was a pervasive characteristic that underlay everything about the union? In my reading of Ampersand 1, yes. I believe that that is what the holding of one of the holdings of Ampersand 1 was. Thank you, Your Honor. Thank you. But the court also found in Ampersand 1 that those sorts of activities were unprotected by the NLRA and that they necessarily threatened the rights of a newspaper employer under the First Amendment. We are here today because the union… The board's misconception of the line between protected and unprotected activity tainted the analysis in that case, but that's not to say that that taints all the other possible ULP controversies between the employer and the union, is it? I think in this very rare circumstance it would because at no time relevant to this appeal has the union or the board disavowed that that was what was driving the activities of this organized unit. Because, excuse me, as we mentioned in our briefing, if these ULPs had been lumped in with the very many that were brought in Ampersand 1, they would have similarly been dismissed without looking at them in each individual circumstance to determine if every single ULP had something directly to do with the content of the paper and the remedies that the board imposed. Ms. Parbir, you say at no point did the union disavow its project of arresting, its ill-advised project of arresting editorial control, but in the order denying the motion for reconsideration and modifying relief in this case, and I'm looking at the May 31st, 2013 board decision, the board says whatever may have motivated the union's organizing efforts at the bargaining table as the record demonstrates, efforts at the bargaining table as the record demonstrates, the union was willing to concede the respondent's right to editorial control. Therefore, we reject respondent's content control defense to the violations found by the judge. So there is actually, I mean, it sounds like you were seeking some kind of, something to point to to say that there's a dam holding back that tainting project. And why wouldn't we think that that is an acknowledgment that the union is on to its legitimate business and no longer trying to control the editorial content of the paper? A few things to that, Your Honor. First, excuse me, with all due respect to that board's ruling in May 2013, the record simply doesn't support that it was a disavowal of the primary purpose because even though at the bargaining table with regard to certain clauses that were being proposed by the union, excuse me, those clauses kept coming back. They kept coming back in different wrapping. Maybe they were diluted, but still those work projects and employee integrity clauses still included varying levels of, excuse me, reporter employee control over the content that would be printed in the paper. But aside from that. So it would be helpful just, I know there's a lot of different ULPs in the case that you're arguing. If you could point to us too and explain what you think are the ULPs that the board resolved in a way that trenches on the papers versus their own rights, that would be helpful. And again, this is sort of putting aside your argument about the taint, but just looking at them, if they came up to us now without the background, is there anything about them that is seeking to arrest editorial control? Yes, Your Honor. So again, and I know you recognize that we're not willing to put aside the taint. I do. That is the context of this case and you can't. They all directly stem from and go toward that purpose to help the union exert control, legal and economic, against the news press publishers. But to answer your question more specifically about which ULPs deal directly with content control and which remedies might infringe upon the news press's editorial content decisions specifically, I can point to at least three for you, Your Honor. First being in dealing with the bad faith bargaining allegation of unfair labor practice, the news press made this argument in a lot of detail below that in response to bad faith by the union, in bringing content proposals to the table, it made very clear that it was still seeking that after certification, seeking that improper, ill-advised content control campaign. And I think that comes most clearly when you're looking at what I call the employee integrity proposal. It was also called the, I think, work projects proposal in the general counsel's exhibit, excuse me, which you can find at the appendix 49 to 50. There were two things in that one. The union was seeking that there could be no correction or retraction without prior consultation with a reporter. They were seeking to prevent the news press from it being able to discipline reporters if they refused to do a story for whatever subjective reason that employer thought it would. What ULP is it that you're saying is effective? That's the bad faith bargaining. I think this is the news press's defense to this was that bringing these First Amendment, these First Amendment, these, sorry, these clauses that deal with First Amendment content control issues to the table was a showing of bad faith on the union's behalf at the table, at the table. So, excuse me, and even though they were rejected, the union pulled them back ultimately, brought them back, watered them down, we ended up with just this byline protection clause. But that was just the end product of a long evolution of... What other ones? Which other ULPs? I'm sorry, just before you... You mentioned three. I'd like to get them listed. Thank you.  Thank you. I'm sorry. The other would be, excuse me, when the, to call it a ULP for the employer to decide that it wanted more articles with fewer, fewer articles with more words as opposed to more articles with fewer words, that we referred to that in the briefing as the one story a day ULP. And then the ULP that was charged after the news press decided to cancel Mr. Minor's gossip column, when it decided what sort of content, you know, what kind of columns it would, and then had to lay him off because he... Okay, and you said, for example, are there others that you think, again, putting aside the taint purpose argument, are there other ULPs that had the effect of interfering with editorial discretion in your view? At this point, I think the direct effect or the remedy associated with it, I wouldn't say that the direct effect of other ULPs would direct the content of the paper. But again, because we read from ampersand one, it's not really that... It's not necessary that the ULP directly affect the content of the paper. What we see here is a broader campaign. I understand, but we're trying to separate your argument. It is possible you will lose that argument. And so if you lose that argument, the question is, do you have a backup argument as to individual ULPs because those actions, those efforts would interfere with the editorial discretion? And that's what we're trying to get. And you've listed three, and I just want to make sure that's your answer. I understand. Yes, thank you, Your Honor. That would definitely be the three that are directly about content control. All of the others have arguments that we could go into. Unfortunately, if we do, if that's what we're going to fight the record on every single ULP, then my client is done for. The news press is a small market paper, a very small readership, I think around 40,000. This is not a large corporation. The union and the board are continually coming after this employer for its refusal to cede editorial control. We're reaching back to 2006. It's got to end someday. And at this point, we see nothing that can stop this from happening, continuing against my client. Even if we were to win here today, we're not sure, my client's not sure that it's a celebratory time because when it comes down to it, the board and the union have demonstrated kind of a shocking refusal to listen to this. The decisions of three federal courts. And so we feel like if we get into each of those things, well, it's over because she's never going to, I mean, I'm sorry, the news press is never going to be able to defend itself against another onslaught of ULPs far into the future. For those reasons, we ask the court to accept the petition and vacate the board's order. Okay, thank you. We'll give you some time on rebuttal. Thank you. May it please the court. My name is Micah Jost for the NLRB. I'd like to begin by addressing the employer's failure to preserve these issues, which result in a jurisdictional bar under Section 10E for the court to hear the fundamental First Amendment arguments that they make here. Fundamentally, what the company is arguing here is that a taint arose based on the activities of employees who favored union representation in 2006-2007, and that as a result that precludes any further prosecution of the company for its unfair labor practices going forward into the future indefinitely until employees are able to comply with some sort of imaginative process the company proposes for balloting, which would somehow demonstrate the subjective views of employees represented by the union. What the company actually argued to the board can be found in its exceptions and brief in support thereof. The only exception the company cites to support the proposition that it preserved these arguments is found at Joint Appendix 1917 and 1918 of the appendix. That is a single exception, number 27 of the 259 exceptions that the company filed, and that exception specifically describes the administrative law judge's background discussion where the judge went through the five related proceedings at that time and noted the McDermott case and said that it would be considered for its content and learning and scholarship. The company filed an exception in which it recited that and said that that was somehow contrary to law or fact. In its brief in support of exceptions at pages three through five, it argued under the heading the history of the labor dispute, so not an argument but rather a statement of the history of the labor dispute. It stated toward the end of its background recitation there at page five that the First Amendment issues in McDermott, quote, should be considered. It never explained how McDermott should be applied, whether McDermott should be applied. It referenced the district court's opinion but not the circuit court's opinion, and it never elaborated on that in its brief. What it did argue at pages 184 and 185 of the brief was a much more limited labor law argument as to the proposals that the union had made. It argued that the union was proposing permissive matters, which it termed to address content control, and that's specifically the work assignments proposal that the union initially made in November, subsequently withdrew, and the employee integrity proposals, which were significantly pared down and which the company demanded the union withdraw and the union also withdrew. The company's argument at 184 and 185 of its brief in support was that by linking permissive issues with mandatory issues, the union engaged in bad faith, which justified the company's bad faith. The words First Amendment, I believe, appear nowhere in that context on those pages where the company makes that argument. It's a labor law concept that the company cannot shoehorn First Amendment issues into. So what the board ultimately did address after the court's decision issued an ampersand was the potential effect that the conclusions in ampersand could have on that bargaining defense. So notwithstanding that the company never cited ampersand 1 to the board and never tried to apply it to that bargaining defense, the board considered whether it could have some effect, and the board's discussion there at Joint Appendix 2044, which is from the 2013 order, makes it very clear that it only understood and was only addressing the possibility that ampersand 1 in this court's analysis there could have some impact on, quote, the content control defense to the 8A5 bargaining violations found by the judge. Let's assume for a second we get to the merits, and on their first arguments, the broad purpose taint argument, and then counsel indicated that if that didn't prevail, that there were some specific ULP arguments that they were raising. And I just wanted to probe one of those. The one story a day, why doesn't that affect editorial discretion? Well, as the board explained and as I think we discussed in our brief, the actual announcement, the actual order was one story a day. That is strictly a matter of productivity. It is a matter of how the work that the employees do, which is necessarily related to content because they're writing content, but it was a metric measuring productivity for employees. Subsequently, when employees came to the employer and asked, how is this going to be applied? How should we do this if we're writing long stories some days, short stories other days? The employer elaborated on how employees can meet that, and it described ways that they could write shorter articles in order to sort of get their productivity up. That's a separate matter. When the employer is describing how many words it wants in an article or how much depth it wants, that is certainly a matter of content. But when the employer is making a blanket announcement at the outset, we want one story a day, that is a matter of productivity that's quintessentially bargainable. That's directly tied, isn't it, to the content that will ultimately appear, in the sense that if you're doing one story a day, there will be more or different content than if you didn't have that requirement. Ultimately, Your Honor, I think you can reduce anything that the parties could bargain over to that. For example, if the union bargains for a 35-hour work week or a 45-hour work week, that's going to affect how many stories employees can write. If the company wants more stories or fewer stories, it can hire more employees. It can hire fewer employees. It has ability, fundamentally, as a manager to get its content in. I think it has to. I understand that the extent of changing work conditions is a bargainable issue, mandatory even. On the one hand. On the other hand, content, the content decision, is a first. The fact that they run into each other and become difficult doesn't mean that we don't have to satisfy them. I'm not quite sure where the line is you're drawing that protects the bargainability of the one story a day as opposed to the First Amendment right to one story a day. Well, first of all, Your Honor, I would note that, to my knowledge, this specific argument that the order as to the one story a day offends the First Amendment was not raised to the board. It was not raised. So the board did not have the opportunity to draw that fine line. And the Newspaper Guild of Greater Philadelphia case from this court emphasizes that the board is in a special position to mark out those boundaries, and the board is entitled to have the first opportunity to do so. But even if the court were to consider that issue, I think it is reasonable to draw the line there, that when a blanket productivity level is being set, that's a different matter from describing how employees should work. Exactly. Right. The other specific UOPs that the company suggests could somehow impinge its content. With regard to Mr. Minard's, again, their brief did not argue to the board. Their exceptions, to my knowledge, did not argue that there was a direct First Amendment violation there. They did argue that as to a separate individual, Mr. Erringer. They seem to have dropped that before this court. As regards to Mr. Minard's, however, at Joint Appendix 1467 through 70, we have Mr. Minard's testimony where he explains exactly what the company told him. And the most important quote there is, quote, that the decision was, quote, nothing to do with the column, but merely a cost-cutting measure. What the company then did, after laying him off, reinforces. Is it JA? Yes, Your Honor. Minard's testimony is between 1467 and 1470 of the record. Go ahead. This was a matter of pure economics, and the board so found. That's at Joint Appendix 1970. When you have a matter of simple economics, whether he was going to write a column as a full-time employee who was paid $75,000 a year, or whether he would write it as a freelance employee being paid less and perhaps having other obligations in addition, that is, again, a quintessentially bargainable issue that has nothing to do with the content of what he's writing. The fact that the company turned around and tried to deal directly with him days after laying him off and made this offer, we would like you to keep writing a column, demonstrates that their concern was not with the content. That's, again, crystal clear from the actual unimpeached, undisputed testimony of Mr. Minard's about what the company told him. As to the bad faith bargaining, the company suggests that at no time has the union disavowed the claims or the motives that it had in Ampersand 1. The first point I would make is that the company is the one raising a First Amendment defense here, and the company bears the burden of showing that there was a nexus, that there were unprotected motives, that there were unprotected activities, and that it was responding to those. That is the narrow factual setting that this Court addressed in Ampersand 1, and it is absolutely not replicated in this case for several reasons. First of all, the company fails to show any sort of unprotected motives persisting through bargaining, and, in fact, the union did repeatedly disavow any such motives. Those express disavowals start, I believe, around May 2008, which is, of course, when the McDermott decision issued in the district court. Where would you point to for those? That's at pages 67 and 68 of our brief. We list numerous record places where the union expressly said that it was not seeking to take content, that content was the responsibility of the employer. One of the clearest examples is at Joint Appendix 1353, where the union said in a letter that the employer has the absolute right to make changes. All that the union is asking for is procedural consultation rights. So, for example, before a change would be made that the company would let the employee know, and those rights don't rise to the level of a First Amendment violation. So for the company to, first of all, distort the bad faith bargaining argument that it actually made to the union, or, excuse me, to the board, which had to do with the labor law concept of linking permissive and mandatory, it takes that and claims that it somehow justifies a broader First Amendment argument. But in doing so, it ignores the clear evidence throughout the record, which provides substantial evidence supporting the board's factual motive determination as to what was driving the union. And it fails to produce any evidence of unprotected activity that could be in any way analogous to I see no reference to unprotected activity that would be analogous to what was at issue in Ampersand 1. Okay. Thank you very much. If there are no further questions, we ask that the court enforce the board's order in full. Thank you. We'll give you a minute for rebuttal. I'd like to address two points that I heard opposing counsel raise. First, with regard to the productivity standards, that is something that the board wants to call this, a productivity standard announcement. This is not like other sorts of cases, the cases where they literally were productivity standards. We're not talking about making jeans on the line. We're not talking about getting and washing a certain number of windows before the day ends. This is a case that necessarily deals with the content of the paper. When the employer is deciding what it wants its stories to look like, it may have an impact on how many stories are being put out weekly. Would you deny that there does exist a realm of possible issues that concern bargainable work conditions as opposed to First Amendment-protected content decisions? There would be, but not in this very rare circumstance because of the organizing purpose of this union. If that tent can be cleaned, I'm not sure at this point that it has. You keep having that thing, the overriding purpose of the union. As I recall the decision in Ampersand 1, we quoted four purposes in the union from the union's own documents. The first and arguably the second related to content. The third and fourth were very clearly labor law issues. So how can we say the overriding purpose when you're referring to one of four previously recited purposes? It is correct. Ampersand does recognize that there were four purposes that were listed by the employees when they were organizing. But Ampersand 1 does hold that the primary purpose was the content control issue. Where did we say that was the primary purpose? I'm sorry? Where did we say that was the primary purpose? I don't have a pencil with me, Your Honor, but I could get it for you if you need. And do you, Ms. Barbier, do you agree with Mr. Dale that the way to purge that would be for the union to be decertified and reconstituted? Or is there another avenue that, in your view, would be adequate to clean the slate and allow these employees to have protections of the labor law through a union? It's an interesting question because this is such an extraordinary case. I'm unaware of any other sort of union that has gone down this path. My thought possibly could be if it doesn't have to be fully decertified, if there was some sort of evidence to show that it still has majority support from the reporter employees absent that improper purpose, well, then maybe that would be sufficient because that would really demonstrate that the union is no longer seeking to pursue the very purposes it was elected for. That doesn't necessarily mean decertification. And why are the union's statements that it doesn't want to control content and that it's, you know, as board counsel put it, post-Ampersand 1, they seem to understand that the position they took in the beginning was literally unsupportable and that now they're going forward saying, we don't want to control content. That's not enough for you. No, because... Why not? For a few reasons. It looks to me, and I think it's reasonable to infer that that is really just a cover. It's saying those things because Ampersand 1 did say you can't just bring in a few wage and hour concerns and, you know, wrap it up with the unprotected. You're saying a lot more about Ampersand 1 than I remember being in there. I didn't write it, but I did sound off on it. It doesn't sound like exactly the opinion you're describing. There is a quote in Ampersand 1 that recognizes that it would be improper to wrap in a few. The court was expressing, it was talking about some concerns about, okay, so you have some wage and hour, bread and butter wage and hour issues. We talked about a taint to the board's decision. I'm sorry? We talked about a taint to the board's decision. That's correct. Being based on a misunderstanding for it to memorize. That's correct. But the idea of the taint to all union activities in the future, to me, I don't see where we laid the foundation for that in Ampersand 1. I don't think that it held specifically that there's a taint that affects all activity into the future. I don't think we made anything about a taint affecting all union activities. Correct, but that's not, we're asking this court to go that step further because we've seen that the union is refusing and has continued down this path. And so it is not expressly Ampersand 1, but it is that step further because as long as this improper purpose pervades, and I think that it has, and I think the record shows that, then that in those rare circumstances, the First Amendment concerns outweigh the Act concerns. Okay, thank you very much. Thank you. The case is submitted.
judges: Kavanaugh, Pillard, Sentelle